SMITH v. FIRTH et al.

(Supreme Court, Appellate Division, Second Department. July 17, 1900.)

CANCELLATION—DEED — INADEQUATE CONSIDERATION — CONFIDENTIAL RELATIONS.

A deed of lands for less than half their value, given to one who was greatly the superior of the grantor in intelligence, and who, sustaining confidential relations to her, played on her unwarranted fears of losing the lands by foreclosure, will be set aside.

Goodrich, P. J., and Hirschberg, J., dissenting.

Appeal from special term, Queens county.

Action by Mary Smith against Christopher C. Firth and others. From a judgment in favor of defendants, plaintiff appeals. Reversed.

Argued before GOODRICH, P. J., and BARTLETT, WOODWARD, HIRSCHBERG, and JENKS, JJ.

Ambrose G. Todd, for appellant.

George M. Baker, for respondents Christopher C. Firth and Anna R. Firth.

James P. Philip, for respondent Robert W. Firth.

PER CURIAM. On a reargument of this case, which was ordered because the four justices who heard the original argument were unable to agree (63 N. Y. Supp. 1116), a majority of the court adopt the following opinion of Mr. Justice HATCH, prepared before his transfer to the First department, as expressive of their views:

The plaintiff is evidently a woman of little business capacity, and with small opportunity of informing herself with accuracy in respect to the conditions as they existed at the time when the transactions which are the subject of this controversy were had. She had little education, and during her lifetime had lived in straitened circumstances, working partly in the house and partly in the field. The defendants were builders, and in capacity, as measured by that of the plaintiff, were in every view greatly the latter's superior; so that, in respect of information and capacity, it is clear beyond the possibility of dispute that the parties did not deal upon equal terms. The defendants' evidence and letters in this respect make clear disclosure of the facts. When the plaintiff first made application to Christopher C. Firth, she was in greatly distressed circumstances, being without money; her husband without work. Her credit to obtain necessary food and clothing for the support of herself and family was low, and she was fearful of its being entirely refused. Some taxes were due upon the premises, but to what amount does not appear. Under these conditions she applied to the defendant Christopher C. Firth, stating to him her needs and necessities, and he promised to see what he could do for her. What was thereafter done by Robert W. Firth was founded upon the original application to Christopher. Robert's negotiations are to be regarded as both for the benefit of himself and his father, as the deed of the premises ran to both. The plaintiff at this time was the owner of thirty-seven acres of land, the value of which, as is fairly to be gathered from the testimony, was not less than $500 an acre; and a finding that in December, 1896, it was in fact worth $800 an acre would have abundant support in the testimony. The defendants did not testify at any time that the property was worth less than $500 an acre, and the witness called by them to testify to value was clearly incompetent to give any correct estimate upon the subject. It appeared that the extension of the railroad to Oyster Bay had added value to the property in that vicinity; that the opening of the shore road had enhanced it to a considerable extent; and while in December, 1896, the shore road had not been carried to completion, yet it was in process of construction, and its existence was an assured fact. Robert W. Firth testified that he thought twenty-one acres of land was worth $5,000; and nowhere is the testimony of the witnesses called by the plaintiff to establish the value of the property contradicted, either by oral evidence, or, so far as appears, by existing circumstances. It is therefore established by practically undisputed proof that the whole property was worth not less than $18,500, and the twenty-one acres not less than $10,500. The whole was subject to a mortgage given by the plaintiff, for $3,500. There is no evidence to show that this mortgage was likely to be foreclosed, or that its foreclosure was even contemplated. On the contrary, $500 had been retained, and was on deposit in the bank at Glen Cove, to be used for the purpose of paying the installments of interest as the same fell due. When the transaction which is the subject of this action was closed, there remained in the bank to the credit of the plaintiff, applicable to this purpose, over $173, so that,

except for her anxiety, she was in no way troubled by the mortgage. She was evidently troubled, however, in respect to her ability to carry the whole matter in the future. When the application was made by Christopher C. Firth to Mr. Eastman, the agent of the holder of the $3,500 mortgage, it was found that this mortgage could be increased by $500. It was then undoubtedly suggested by the plaintiff that, while this increase would afford temporary relief, yet in the end she would be required to sell some of the land in order to rid herself of the incumbrance, and I assume that she applied to Robert W. Firth to become a purchaser of the twenty-one acres. In respect to that transaction the testimony of Robert, the letters which he wrote, and the whole course of the dealing which finally culminated in the deed, showed beyond controversy that the plaintiff relied upon him to give her a fair price for her land. To my mind, the evidence and the inferences which arise therefrom leave no reasonable doubt that in respect to this sale she relied upon and was influenced by Robert's statements to her, and dealt with him in the belief that he would pay the fair and reasonable value of the land. Under such circumstances, the law requires that the transaction shall be absolutely fair, and does not tolerate the slightest advantage being taken by the stronger of the weaker party. Ten Eyck v. Whitbeck, 156 N. Y. 341, 50 N. E. 963. Robert W. Firth first agreed to pay $5,000 for the twenty-one acres. This was less than half the sum which the evidence establishes that the premises were fairly worth. When the contract of sale came to be executed, he repented of his offer to the extent of $500, reducing it to $4,500. The transaction in respect to the mortgages was had with Mr. Eastman, who was the agent of the owner of the $3,500 mortgage. Robert arranged with him to place a mortgage for $2,500 upon the twenty-one acres, and he gave to the plaintiff a second mortgage for $2,000 upon the same premises, as part of the purchase price. The plaintiff gave a mortgage for $500 to Eastman upon the remaining part of her land. It is said by the respondents that she also received from Robert $500. It is evident that she received only $200 in cash out of the transaction, the balance being represented by merchandise. The money which was in the bank at Glen Cove belonged to her, and formed no part of the purchase price. In addition to this, there appeared to be some dispute about the title to an acre and three-fourths of the twenty-one acres, whereupon Robert insisted upon receiving, without making further compensation therefor, about an acre and three-fourths of land from the other piece, which gave him a rear entrance to the land upon Canoe road. Whatever may be the merits of the dispute regarding the title to the acre and three-fourths, it is clear beyond question that plaintiff's title to it, if any, was conveyed when the defendants took title under the deed. So that in this part of the transaction the defendants have secured all of the plaintiff's interest in the disputed tract, and also one and three-fourths acres reaching to the Canoe road, as a net result of the whole transaction. The plaintiff has a second mortgage for $2,000 on the twenty-one acres. She has been relieved from the $3,500 mortgage, but in its place there is a mortgage upon her own property of $1,500. She may have received $500 more in some form. This is the total benefit which she has received for property worth not less than $10,500, and is the result of dealings with parties who were professedly acting as her friends.

Such a transaction, I think, ought not to be permitted to stand, and it seems to be condemned by familiar rules of law upon the subject. The learned court below stated, in support of its conclusion: "All her property was covered by a heavy mortgage. She had absolutely no means to pay taxes or interest. It was only a matter of a short time before she must lose everything. She was obliged to sell at least a part of her land to save anything. By the sale of the 21 acres she saved her home and 15 acres of good land, and secured about $1,000 besides." It cannot be said that $3,500 was a heavy mortgage upon property worth at least $18,500. There is not a particle of evidence in the case to show that she had no means to pay interest. On the contrary, the proof was that the balance in the bank was then sufficient to protect the mortgage. It is clear that anxiety was her only reason for selling. Her property was being enhanced in value every minute, and, if held, would shortly have produced a competence for a person in that station of life. She was not obliged to sell the land for any existing contingency. Mr. East-

man stood ready to increase the $3,500 mortgage by $500, and it is evident that such sum would have met all of her present necessities. Her anxiety was as to liability for the future, and of this anxiety the defendants seem to have taken advantage, to their considerable profit, and at an expense to them not to exceed $500. This latter consideration answers any claim that she was a gainer by the transaction to the extent of $1,000. If this transaction can stand, then I am unable to see how relief can be obtained in any case against the acts of the stronger party, who, whether intentionally or otherwise, deprives the weaker party of property, without adequate compensation.

This view leads me to the conclusion that the judgment should be reversed, and a new trial granted; costs to abide the final award of costs.

GOODRICH, P. J. I cannot agree with the opinion adopted by the majority of my associates, and find that the expression of my views requires a careful statement of the evidence upon which my opinion rests.

The plaintiff, a woman 48 years of age, was the owner of 37 acres of land at Oyster Bay, Long Island, with considerable shore front, which added to its value. On November 21, 1896, she made a written contract with the defendant C. C. Firth by which she agreed to convey to him 21¾ acres for the price of $4,500, payable, $100 on signing the contract, $400 on the delivery of the deed, $2,000 by Firth's assuming a mortgage of that amount on the land, and $2,000 by Firth's executing to her another mortgage of $2,000. The plaintiff on December 29th executed a deed of the property to C. C. Firth and his son, the defendant Robert W. Firth; and on the same day, for reasons not necessary to state, she executed another deed of a tract of about 1¾ acres. The plaintiff in November, 1897, commenced this suit to set aside the conveyances on the ground that the defendants had unconscionably and fraudulently induced her to sell the lands for a very inadequate consideration,—much less than their real value. The defendants denied the equities of the complaint, and after hearing the evidence of both parties the court dismissed the complaint, delivering the following brief opinion:

"The evidence does not justify a finding that the defendants Firth were guilty of any fraud or bad faith, or took any undue advantage of the plaintiff, upon their purchase of the 21 acres of plaintiff's property. All her property was covered by a heavy mortgage. She had absolutely no means to pay taxes or interest. It was only a matter of a short time before she must lose everything. She was obliged to sell at least a part of her land to save anything. By the sale of the 21 acres she saved her home and 15 acres of good land, and secured about $1,000 besides. She was fortunate, under the circumstances, to secure so favorable a result. I think she was mistakenly advised to commence this action. It is an act of mercy, rather than justice, not to impose costs upon her. Complaint dismissed, without costs."

From the judgment entered on this decision, the plaintiff appeals. The law which governs a case of this character is well established. When the plaintiff proves in the first instance a confidential relation existing between herself and the defendants, or one of them, as principal and agent, the transaction is to be scrutinized with extreme vigilance; and, to support it, clear proof is required that the transaction was understood, and that there was no fraud, mistake, or undue influence. Ten Eyck v. Whitbeck, 156 N. Y. 341, 50 N. E. 963. The defendants in the present case may further defend by

proving adequacy of consideration, as bearing upon the question of undue advantage. There being in the present case no relationship by blood or marriage, the plaintiff relies upon the conversation between herself and the defendant Robert W. Firth to establish the relation of principal and agent, and to show that she employed him as her agent to assist her out of financial difficulties connected with the property. It is to be observed that at the trial her counsel expressly disclaimed any charge of breach of trust by C. C. Firth, saying, "We don't accuse Mr. Christopher Firth with anything, except as to the subsequent deed." Therefore I shall confine myself to the question of the relation of R. W. Firth to the plaintiff, in considering the evidence which the plaintiff produces, and the denials of the defendants. Before doing so, it becomes necessary to state the circumstances relating to the property in question. The plaintiff, previously to the periods in question, had purchased the 37 acres at a foreclosure sale under a mortgage which had been made to her father, the previous owner, by one Sackett, on the sale of the property to him. The property did not realize the amount of the mortgage, and was bid in by the plaintiff at $6,450, no one else bidding. Thereafter she executed a mortgage to the Glen Cove Bank for $3,500, which mortgage, previously to the transactions under discussion, had become due, and was liable to foreclosure. The plaintiff testified that C. C. Firth in 1892 applied to her to buy some of the land; that she at that time refused to sell; that in August, 1896, he made a similar application, which was likewise refused. The interview at this latter application forms the basis of transactions out of which the plaintiff claims that the charges of fraud began to arise, and it becomes necessary to detail at length the plaintiff's testimony, which stands alone and uncorroborated, as to what occurred at that and subsequent interviews with the Firths. She said that at the first conversation she told C. C. Firth about the mortgage and a power of attorney which she had given to a Mr. Wright, the contents and purpose of which are not disclosed by the record, but which the plaintiff seems to have feared would prevent her sale of the property. She testified that she asked Mr. Firth to take a new and larger mortgage on the property, so as to permit the payment of the old mortgage and leave her a balance; that she told him she was poor and had need of money; that he told her he would get her a new mortgage; that he called on her again on Labor Day (the first Monday of September); that he said she would hear again from him soon; that, not hearing from him, she called on him at his house about a month later, when he said that, if he did not take the mortgage himself, he would get some one else to do so, and that she did not see him again on the subject; that in October Robert W. Firth came to her house and asked her what she would take for the property, and that she told him she did not want to sell, but only wanted a larger mortgage; that she told him she was poor, in need of money, and wanted to mortgage, and not to sell, the property. She testified:

"I saw Mr. Robert Firth frequently after that. He talked a great deal about the property, and asked me questions about it. He spoke of my relatives. He said he had been learning a great deal about them,—my relatives; about

that they were thieves, and would, no doubt, rob me of my property. He said that I was only safe in keeping from them; that I was to keep from them. He said that he was my friend, that he would be my friend, and that he would do all in his power to protect me. He said that, if it had not been for him, my enemies would have turned me out of house and home."

Referring to a later interview, she testified:

"I asked Mr. Firth for a loan of a hundred dollars. I was so pressed and I was so in need that I asked him. I told him I was afraid that I could not get any more credit from the store, my husband was out of work, and we were all in need of clothes and food. He said that he would help me. He said, if I would only trust to him, he would help me."

There was another interview on December 7th, as to which she testified:

"I had asked him for a loan of a hundred dollars, as I was in such need of money. He said that I must sell him the property. I said I did not want to sell, but, knowing that I was in such great need of money, then I agreed to sell. Before I agreed to sell he said he had looked up the title, and he did not believe there was a good title in the whole of it. He said that that, with the power of attorney, would make it impossible for me to either sell or get a mortgage. This 7th of December, when he came down, and I promised to sell him the property, he spoke about my relatives and my enemies. He was always speaking of my enemies. He said that I was surrounded by enemies, and that I must trust in him, and that he would help me and be my friend. * * * He agreed to give me— He wanted me to sell him the 21 acres for $5,000. He was to give me $1,500 in cash, pay off the Glen Cove mortgage of $3,500, and then I was to have my 15 acres free and clear. That was all that occurred that day. Then he went away."

According to the plaintiff's testimony, on December 24th she received a letter from Robert W. Firth, stating that he would call upon her, and on the 29th he did so. As soon as he got into the house he sent her husband to the station, to meet Mr. Eastman, who was searching the title for a mortgage of $4,000 on the whole property. Firth took her into another room, away from her mother and children, "talked nervous and quick, and said that there was so little shore front that they did not want to pay more than $4,500 for the property,—the 21 acres. And then he said he was very short of money just then, and wanted a temporary change of mortgages. About that change of mortgages, he said that he would give me a $2,000 mortgage, and he would take a $1,500 mortgage on my 15 acres, and that the interest from his $2,000 mortgage would pay the interest on mine, and I would not have any interest to pay. I did not say anything. I didn't understand it very well. I think I said I did not understand it. Q. Just tell exactly what you said and just what he said. What did he say when you told him you did not understand it? A. Well, he said it would be all right; that he would see that I was all right; that I must trust him, and he would not take any advantage of me. He knew I wanted to do right, and I would not be doing right if I did not do that way. And I did not say anything, and I thought that he was a friend, and I did not say anything. I agreed to what he said. Q. Then, did anything else occur or was anything else said before Mr. Eastman arrived? A. He said that I ought to give him a little more land to make up the loss of shore front. I did not say anything. He said, if I would only agree to what he said, it would be all right." Her testimony continued, to

the effect that Firth brought with him some papers,—about half a dozen; that he read over to her parts of two papers, and no more; that after Mr. Eastman came she signed the papers, none of which were read over or explained to her by Mr. Eastman. Mr. Stuart, a notary public, also was present and took the acknowledgments. After Eastman and Stuart left, Firth remained, and said he would take the papers for recording. "He said he did not want me to tell any one that I had sold him the property. * * * What I did that day I did in reliance upon the honesty and good faith of Mr. Firth." At this meeting six papers were executed, of which two were deeds to Christopher C. Firth and Robert W. Firth, jointly, of the 21¾ and 1¼ acres respectively, both acknowledged before Mr. Stuart. There is a memorandum in the record of a bond and mortgage, dated December 29th, made by the plaintiff to Catharine Mott and Henry M. W. Eastman, for $2,500, on the 21-acre parcel, and a bond and mortgage of the same date by the plaintiff to the same mortgagees, for $1,500, on the 15-acre parcel. It does not appear before whom the acknowledgments were taken, but there is evidence that these four documents, with the two deeds, comprised the "half-dozen" papers executed by the plaintiff, according to her testimony, before Mr. Stuart on December 29th. There appear also in the record a bond and mortgage on the 21 acres, of the same date, for $2,000, executed by the Firths and their wives to the plaintiff; also, two deeds from Robert and wife to C. C. Firth, respectively conveying one undivided half interest in the two parcels. These deeds and the bond and mortgage bear date of, and were executed in Brooklyn on, December 29th. The effect of these instruments was that the plaintiff, having executed a mortgage of $2,000 on the 21 acres, and of $1,500 on the 15 acres, conveyed the 21 acres to the Firths for $4,500, taking back a second mortgage of $2,000 thereon, which was the mortgage referred to in the contract. One hundred dollars had been advanced to the plaintiff before the contract, and there remained due to her, above this sum and the mortgages, $400, which was afterwards paid to her by Firth. The result is that she retained 15 acres subject to a mortgage of $1,500, for the payment of which she had the security of the $2,000 mortgage on the 21 acres deeded to Firth. On cross-examination the plaintiff testified that she first agreed to sell the property to the Firths on December 7th. Being shown a paper dated November 21st, she admitted her signature thereto, but, on being informed that it was a contract of sale of the 21 acres to C. C. Firth, dated November 21st, she said that she never signed it before the date of signing the deeds. Appended to this contract is a paper signed by Mrs. Deborah Allen, mother of the plaintiff, stating that she held an unexpired lease on the 21 acres, which she covenanted to release on the execution of the conveyance. This covenant has no date, and is written in pencil. The contract and the covenant were both executed before Robert W. Firth as a subscribing witness, and he testified that they were executed at the plaintiff's house on November 21st by the plaintiff and her mother. The plaintiff testified that her mother did not sign any such paper, or any other paper, till the day of the sale. The plaintiff also testified that she was to

receive a $2,000 mortgage as part of the consideration of the deed to Firth, but that she never received it until she wrote to Firth demanding it, and that she did not ask him to keep it off the record for a while. The defendants produced a letter from her dated January 18, 1896, in which she said, "I think you better not record my mortgage till I say to, as I fear they will make trouble if they learn what I am doing." The plaintiff further testified that her husband and children knew that she was selling the property to Firth.

This review comprises all the evidence given by the plaintiff to support her theory that the relation between herself and the Firths was one of trust and confidence, and that they took undue advantage of her. It wholly lacks corroboration. The material parts of it are absolutely denied by the Firths, who testified in detail and at length as to the fairness and openness of all their dealings with the plaintiff. It does, not seem necessary to state their evidence at length, but it may be said that C. C. Firth testified that he went to Mr. Eastman, who represented the bank, and arranged with him for an increase of the mortgage loan to $4,000; that the plaintiff said that would only keep her temporarily, and that she wanted him to buy a part of the land; and that he did not agree to buy in October, when the plaintiff came to his house. This is corroborated by Anna, wife of C. C. Firth, and their son Albert, both of whom were present at the interview. They testified that the plaintiff said that an increased mortgage would be of only temporary assistance, and urged C. C. Firth to buy some of the land. Robert Firth denied that he had had any confidential or private talk with the plaintiff, as she had testified. He was examined specifically and in detail upon the parts of the plaintiff's testimony as to conversations between them on which she relies to establish a relation of agency to secure a larger mortgage, and testified that she wanted his father to buy the mortgage or get a new one. He denied her testimony as to conversations tending to establish any confidential relation between them. He testified that she did not tell him that she wanted a larger mortgage, but that she came to his father's house and said that she would be unable to meet taxes and interest, and that she wanted to sell a part, and have the rest free and clear, and that she "must have relief by the sale of some of the lands"; that it was her own proposal that he should purchase a part; and that it was some time after her proposal that he purchased. His evidence contains a complete denial of all her statements as to the employment of himself as an agent, or that any relation of trust or confidence existed between the plaintiff and himself. He also testified that Mr. Eastman had asked him in her presence not to record this $2,000 mortgage to her until the prior mortgage had been recorded, and until she asked him to do so. This is confirmed by her letter, already referred to, and by the fact that the two daughters of the plaintiff were present at the interview, and later Mrs. Deborah Allen, and none of the three was called as a witness by the plaintiff. Mr. Eastman also testified that Miss Allen and (for a part of the time) Mrs. Deborah Allen were present when the deeds were executed, and that he "explained to Mrs. Smith the contents of the papers signed by her. She made no objection to the papers,—the contents." He said later, however, that

these papers were only the two bonds and mortgages; that Deborah Allen executed and acknowledged a release of her interest, which was delivered to him; and that he had it recorded. Evidently, this is not the covenant annexed to the contract of sale, as that does not appear to have been acknowledged before a notary public. Stuart, the notary public, also contradicted the plaintiff as to her knowledge of the contents of the papers acknowledged by her before him, saying that she told him that she knew their contents. On this evidence the court found against the plaintiff, as to the existence of any relation of trust between the parties, and the existence of any fraud, bad faith, or undue advantage on the part of the Firths. As the witnesses and the manner in which their testimony was given were seen by the justice, it would be against the rules of procedure to reverse the judgment unless this court could say from an examination of the evidence that his finding was against the weight of evidence. On this point, after careful consideration, I agree with his decision.

There remains the second branch of the inquiry,—whether the price was grossly inadequate. The case is not one of a sudden transaction between the parties. No one can read the record without seeing that the plaintiff, being in financial difficulties, was anxious to sell a part of her property in order to relieve the remainder from incumbrance, and that she repeatedly had asked the Firths to purchase some of it. The price at which she agreed to sell to them the 21 acres was at first $5,000. This plot was supposed by the Firths to have more shore front than it really had, owing to some confusion in the description, and the price was reduced by negotiations between them to $4,500. This would be a little more than $200 per acre. The plaintiff produced two witnesses as to value, one of whom, Mr. Oakley, a real-estate dealer, stated the value of the 21 acres at $800 to $1,000 per acre, or $18,000 to $21,000 for the whole; but he said on cross-examination that his valuation was based upon the value of the property in the vicinity during the last two or three years, and the improvements that had been made since December, 1896, especially a shore road along the property, which had been projected before that time, but was very much opposed, and finally decided upon only after the plaintiff's sale to the Firths, and that in the years 1893 to 1896, both inclusive, "the property had virtually no value in the market," adding, "Of course, it had a value." The plaintiff's other witness as to value, Mr. Pearsall, testified that the value was $500 an acre in December, 1896. He sold the Van Cott farm, of 90 acres, having a shore front of a half mile, at about $250 per acre. Of course, the value of one piece of country property is no criterion of the value of another piece, as the surroundings and lay of the land differ in so many ways; but, as this witness referred on his direct examination to his sale of the Van Cott property as one of his qualifications as an expert on value, in forming our estimate we may pay especial attention to that sale. The defendants produced no witness as to values, except Mr. Wilkinson, who testified that he lived near the plaintiff, and that, while he was not a real-estate dealer, he had purchased and sold real estate in the vicinity, though none within half a mile. He further said that he had not negotiated sales of real estate in Oyster Bay. He estimated

the value of the plaintiff's land as from $200 to $300 per acre. Though his evidence is not of the most satisfactory character, it is of some assistance in arriving at an estimate of value. The plaintiff attempted to impeach the veracity of Robert W. Firth. For this purpose two witnesses were produced, Boschen and Rosecrans, and it was shown on cross-examination that each had had financial disagreements with Firth. Boschen stated that he did not know Firth's reputation for veracity, but that personally he would not believe him under oath. It was proper for the court to, and probable that it did, disregard altogether the evidence of these two witnesses, as each had had disagreements with Firth. An unsustained assault of this kind upon the character of an opponent reacts against the party offering it. Thus it is left to determine the question whether the uncorroborated evidence of the plaintiff establishes as a fact that Robert W. Firth was her confidential agent to obtain a mortgage, or to assist her out of her financial difficulties. She was a woman of mature years, and, judging from her testimony, well able to care for her own interests. Even on her own testimony, standing fair, uncontradicted, and unimpeached, the court justly might have decided that there was not sufficient ground for the claims which she presses as the basis of her action; but when she was positively contradicted by the defendants as to that part of her testimony out of which an agency or advantage could arise, and by disinterested witnesses on other points, and by her letters and her signature to the contract, which she denied until the signature was shown to her, and when it appears that she failed to produce as witnesses several persons connected with her, who had some knowledge of the interviews and the facts, and also that Robert's negotiations for purchase were commenced in October, and not consummated till December 21st, I believe it was well within the power of the learned justice at special term to decide that the plaintiff had failed to establish the allegations of agency, fraud, undue advantage, and inadequate consideration. I see no reason to disagree with the determination reached at special term, and think that the judgment should be affirmed.

HIRSCHBERG, J., concurs.